Case number 5-12-0581, Pamela S. Jenkins v. Workers' Compensation Comm'n. Counsel, you may proceed. Thank you, Your Honor. Good morning, Your Honor. My name is Dennis Field and I represent Pamela Jenkins. The issue before this Court this morning, this Court is going to have to address, is the effect of a stipulation contained in a request for hearing. In the case of Barr, prior to the hearing, we submitted to the arbitrator, Arbitrator Teague, a request for hearing that contained a stipulation that Dr. Byler's treatment was causally related. Dr. Byler treated my client for chemical burns to her face. I'll just back up all the facts regarding that in my brief, but I'll give them to you briefly. Based on June 24, 2010, my client was working as an operating room nurse and a liter of phenol was dropped in the operating room that was in the room next to her. And over the next hour and a half, she continued to provide treatment to the patients in that operating theater. And while she was doing this, her fellow workers were being removed and being treated. During this time, or after about an hour and a half, well, after providing treatment for about an hour, working in there, she, half an hour ago, she went and she found her surgical mask and put it on and provided some protection. After about an hour and a half, she became ill and she found her water and she was sent to the emergency room. In the emergency room, she was treated by Dr. Byler for chemical burns to her face and chemical burns to her eyes. And he also treated her for chemical burns to her lungs, the effects of that. We stipulated that those bills were causally related and they should have been paid. She was then admitted to the hospital and she was treated by Dr. Shenowick and Dr. Rowden. And those two doctors treated her for the chemical burns, not only to her face, but chemical burns to her lungs. And we stipulated that those bills should be paid, that they were all causally related. That was their diagnosis, gentlemen, that it was chemical burns to her lungs. Positive diagnosis. We also stipulated that the bills of Dr. Homer Ferguson would be paid. He's a board-certified ophthalmologist. We treated her for the chemical burns to her eyes. And we also stipulated that Dr. Vest's treatment, Dr. James Vest, who is a board-certified pulmonologist, and he's the head of the pulmonology department for the respondent, or at the respondent's hospital, Memorial Hospital. We stipulated that his bill would be paid up to a certain date. And that his treatment and the condition he was treating her for was causally related to this chemical spill. So the issue that comes before this court, and then at the hearing, we know that Arbitrator Teague ordered those bills paid. But then later she found, in the same hearing, that the treatment for Dr. Vest, or provided by Dr. Vest, was not causally related to the chemical burn. Even though the parties themselves had stipulated in our request for hearing that they were. Well, can you stipulate as to the ultimate result or ultimate decision of the commission? Well, does that stipulation mean the case is over? No, no, no, no, no, no. It does not. But Arbitrator Teague, when she ordered the bills paid, she had to make, she by implication, made a finding that they're causally related. She must. That is a finding by the arbitrator. I'm not saying, you know, that that treatment is causally related. We have stipulated such, and she has found that such is causally related. Well, can she correct, is there any law that prevents an arbitrator from, you know, reversing the earlier decision in the same hearing? Let's assume everything you say is true. Right. Couldn't she decide later that she's not going to abide by that? She could. She could if she, but that's, there's in the WIRED decision that I decided to, what has to happen in that instance. Once there's a causal connection established, then the arbitrator needs to have a finding, a specific finding, that that condition ceased. Because we've had a finding that says this is causally related. We've not, you know, she did not say. There is no specific finding that any particular disease is causally related in the arbitrator's decision. Only by implication. Only by implication. Now, you said you stipulated to the payment of medical bills through a certain date. What was that date? That would have been, I believe, August 26, 2010. 2010. And the arbitrator found that any medical treatment after that date was not causally related. Correct. So the arbitrator didn't make a finding contrary to your stipulation in any way, shape, or form. True? False. Only by your so-called implicit? Only implicitly. Because what she has to do in order to find that it's not causally related is, there's a very specific thing that she must do. She has to say that what he was treating her for ceased to exist. Why can't the arbitrator do exactly what she did, which is find that your lady had a temporary injury that had resolved by August 26, 2010, and any treatment after that was no longer causally related? If she, only if that specific, that's not what she did. She has to make that specific. She has to make that specific. In this particular instance, what she said was, is that the condition that she was being treated for, which had continued, and Dr. Vest was treating her for the restrictive airway disease, was no longer causally related. There was no question as to if she was still, you know. Well, she made that specific finding, the reactive airway disease? She just said whatever she said. Yeah, right. She just said, the arbitrator said she's no longer suffering from any disease related to this accident. But at the same time, she says she was suffering from a disease. And that's, and that's why, you know, she's suffering from a lung disease, and yet she doesn't say whether or not it's reactive airway disease. She doesn't say what it is. Well, she says she accepts the opinions of Dr. Paul, I think it was, who said she had hyperventilation syndrome, but that was not causally related. And we've heard a lot about Dr. Paul. Dr. Paul is a allergist. He is not a board-certified pulmonologist. And he had no experience dealing with fenal injuries. Does that mean that the commission can't rely on him? No, the commission can't rely on him. We're talking about a manifest way to the evidence here. When we've stipulated through our actions that Dr. Vest's treatment and the condition that he's treating her for is causally related. Now let me see if I can clarify a point. Dr. Paul specifically opined that the claimant had suffered a temporary injury as a result of the exposure that nobody, if you point it out, disagrees with. But then Paul goes on to find specifically any injury he had received from the exposure had resolved itself by the time of the examination. What's wrong with that? What's wrong? Well, the arbitrator herself says that she's suffering from a condition, in her opinion. Implicitly? No, explicitly. She says she's suffering from a condition, and it's a lung-related condition. We do not know, and the arbitrator did not find, what that condition was at the time of hearing. The only one who rendered any opinion on what that condition was was Dr. Vest. Dr. Vest specifically said she is still suffering from the reactive airway disease. That is the opinion as to what she was suffering at that time. Well, if Paul says she's not suffering from anything. But the arbitrator said she is. Would you direct us to that specific statement of the arbitration decision? I'm sorry, gentlemen. I do not have that attached to my brief. The arbitration decision? The arbitration decision. It isn't. It certainly isn't. Is it? Yes. Okay. Okay. It says, therefore, the arbitrator concludes petitioner's current condition of ill-being is not causally related to the accident of June 24, 2010. She specifically finds that. Well, but Paul said she had a condition. It was called hyperventilation syndrome. Dr. Paul diagnosed the petitioner with hyperventilation syndrome, and he goes on to explain it. And the arbitrator said, look, it's not causally related to your injury. But she doesn't say that that's what the petitioner is suffering from. Does she have to? Yes. What's the best case that says she has to? That would be the Weyer case, Weyer versus the Industrial Commission. And that case says she has to say what that condition is? Well, in that particular case, what we were dealing with there was a shoulder injury. Yes. And what the court said, we had a shoulder strain, which was being treated. And then the court said you had to follow the rule in the case. And in order to get to that, you know, the arbitrator ruled. You mean law of the case. What's that? You have to follow the law of the case. You have to follow the law of the case. This case has nothing to do with law of the case. Zero. There was no opportunity to appeal her first finding before she made her second finding. That's required for law of the case. This has nothing to do with law of the case. Zero. Absolutely nothing. So what does it have to do with Weyer? In Weyer, if you get a 19B and they found there's a causal connection between the broken arm and work, and you don't appeal it, you can't argue when you go back for the permanency that there's no connection between the broken arm and the work. Because you had an opportunity to appeal it. You didn't. So it becomes law of the case. In your case, it's within the same decision. It can't possibly be law of the case. It doesn't even fit into the definition of the concept. Then once we stipulate to it, though. What does that have to do with law of the case? Can you appeal a stipulation? No. And the arbitrator finds that it's causally related? We're saying now we're ending up with inconsistent? She finds that it's causally related up until August something of 2010. Doesn't find that it's causally related after she specifically finds it's not. I mean, you can take some license with the facts, but you can't destroy it. I mean, come on. Let's be a little bit honest with what's in this thing. There's absolutely no question that she awards benefits all the way up to the day that you stipulated that this woman had a causal connection. Correct. Okay. And then she says after that, no causal connection with the current condition. And the evidence of current condition from Paul is hyperventilation syndrome. So what's the problem? The problem is that we'd already stipulated. To what? To the fact that the reactive airway disease was causally related to the injury. She said up to August the 26th, 2010. Right. Who says she's still suffering from reactive airway disease? Dr. Vest. But Dr. Paul says she's not. And the arbitrator does not tell us what she's suffering. No, she turns around and says there's no causal connection between what she's suffering from and her injury. But she doesn't say if it's reactive airway disease, then it's causally related. Okay. And that's my point. It's what she'd been treated for. Once the causal connection is established, then we have to have a finding that it stopped and did not reoccur. And that's what I'm asking for here, is that there was no finding that it stopped and did not reoccur. And Dr. Vest is saying she is still suffering from the condition that I was treating her for prior to, you know, throughout. So there's been no break in the causal connection. And that's the entire point. Once that's established, there has to be a specific break. Thank you. I'll see if your time is up. Thank you. Ms. Lorenz, you may respond. If you wouldn't mind, respond to that last summary by proposing counsel. That seems to be the case. Is that correct? Yes. Because he sees it. Yes. The issue in this case, as posed by opposing counsel, is that the law of the case doctrine prevents. Ma'am, don't even bother to go there. You can't win on that argument. It's not the law of the case, period, period. As a matter of law. As a matter of law. It can't be the law of the case. So go to the rest of the argument. Don't snatch the feet from the jaws of victory on this. He loses there, as a matter of law. But go to the other issues, the factual issues that he's arguing about, the inconsistency within the opinion. Okay. He's arguing that there's an inconsistency in the opinion, from what I understand, because of the law of the case doctrine. He's saying that the arbitrator initially found a causal connection, and then now she can't find it, that there is no causal connection at all. He is citing to the WIRE case, which actually stands for the proposition that an arbitrator is not bound by the law of the case when determining causal connection at two different points in time. So in that case, at the first hearing, the arbitrator found causal connection. There was no appeal. And then at the second hearing, the arbitrator found there was no causal connection. The appellate court held that the arbitrator was not bound to follow the law of the case, because at the second hearing, they were determining the condition suffered at that time, not the condition suffered at the time of the first hearing. So I think that is primarily where the law of the case doctrine is getting mixed in with the facts here. So this case would actually support the proposition, is that correct? The WIRE case actually does support my position. Well, it's assuming that the law of the case doctrine even applies. Right, assuming it even applies. As we know, it doesn't. Correct. As far as the issue as the employer sees it, is that this is a classic manifest way of the evidence case. This is not a question of law at all. This is a question of fact. So once we get past the so-called law of the case, the ultimate issue is whether the evidence in the record is sufficient to support the commission's decision. Yes. Isn't that the ultimate issue? That is the ultimate issue. And you're going to point to Dr. Paul, and you're going to say it's sufficient, right? Exactly. There's Dr. Paul. He said that there was merely a minor irritation as a result of the phenol exposure at his exam. The petitioner was hyperventilating, in his opinion. He said that he couldn't tell whether that was voluntary hyperventilation or involuntary hyperventilation, and that in any case, the phenol exposure, whatever condition she suffered as a result, had cleared by the date of his exam. There was no causal connection with respect to the hyperventilation syndrome. Dr. Vest based his opinion on an incorrect history given by the petitioner, and the petitioner has a history of embellishing the facts in this case. The petitioner told Dr. Vest that she was actually in the room when the phenol was spilled, and in fact, she was at lunch in a different room, in the break room. She also told Dr. Vest that she had no prior pneumonia, when in fact, the record shows that she had pneumonia earlier, within a year before that. At first, the petitioner denied having pneumonia, and she admitted it one page later in the record. Also, Dr. Vest agreed after seeing the doctor's reports that she did have pneumonia. Now, I know that petitioner wants to split hairs as far as whether pneumonia was on the report as a problem, under the problem list, or whether there was an actual diagnosis. Either way, it seems that she had some sort of issue with pneumonia that she didn't tell Dr. Vest about. She was giving him an incorrect history, and Dr. Vest agreed in his testimony that he was given an incorrect history, and that was inconsistent with his opinion. Furthermore, the employee caused abnormalities in her pulmonary function test performed by Dr. Paul. She was sticking her tongue into the mouthpiece, preventing the test from being accurate, and then employee on appeal complains that a second test was performed, where she was given bronchodilators in the first test, causing the second test to be normal, under her assertion. But Dr. Paul did confirm in his testimony that if a second test is performed, it would never, in a true asthmatic, go back completely to normal. Also, the petitioner gave differing testimony as to whether she wore a mask versus didn't wear a mask during this whole procedure. First, she said she never wore a mask, then she said she wore it after a little while. There was also some controversy as to how long she was exposed to the phenol, and how much phenol was dropped and spilled. The employee testified that she was exposed for an hour and a half. The ER records that are actually in the record show that she was exposed for five minutes. Also, employee testified that there was a liter of phenol spilled, but then later said she didn't know. She couldn't have any way to tell how much phenol was spilled. And then finally, the employee testified as to her peak flow readings that Dr. Vest was having her do. And this is a breathing test that she does every day. And she read into the record the last two weeks of testing, and 90% of her readings, I believe all but two or three, were normal. And the ones that were not normal were very close to being normal. Even Dr. Vest testified that the fact that her readings were normal, and she was complaining of shortness of breath, quote unquote, did not jive. And this was her own doctor testifying. So in conclusion, I would just say that the manifest weight of the evidence supports the Commission's findings. The law of the cage doctrine does not apply here. And Memorial Hospital requests that this court affirm. Thank you. Thank you, counsel. Mr. Steele. Mr. Plotnick. I'll just pick up with the normal peak flow readings I just wanted to point out to this court. Normal while she's on 40 milligrams of prednisone. And that's what Dr. Vest was saying. He was saying, I can't expose her, send her out on 40 milligrams of prednisone. I take her off prednisone and she can't breathe. That's what he testified to at that time in his deposition. I can't send her out in public. I can't send her into the hospital. She's on 20 milligrams twice a day. I can't send her out. She breathes perfume. She'll have, she's going to react to it. She won't be able to breathe. That's what Dr. Vest testified to. So the peak flow readings, and that's what Dr. Vest testified to. All I'm using those for, when she's on that much prednisone, is to regulate how much prednisone I'm going to give her. Once she reaches this normal level and he's following her, if she stays there for a period of time, he's the man that's judging this, not us. He says, then I will try and scale back her prednisone. And at one point in time he tried to scale back her prednisone and she couldn't breathe. That's what we're talking about here. She could not breathe. He could not take back her prednisone. She was still doing breath treatment twice a day. She was still using, I believe it's called Advair, when she would have an attack. All of this was there at the December hearing. Nothing had really changed from July when she was being treated with Dr. Vest to December when she was being treated with Dr. Vest. Nothing had changed. You know, they're relying on these peak flow readings when in fact that's misfeeding. If her peak flow readings were normal and she was not on 40 milligrams of prednisone, then I would have to agree with you. No question. Go back. You're healthy enough to return to work. That's not what we're dealing with. We're dealing with someone suffering from a reactive airway disease, which did not have to be break. And that's my whole point, is that there was never any break found. You know, no specific break found of the reactive airway disease. In fact, Dr. Paul, as I said, he's an asthma specialist. He's an allergist. He's not a pulmonologist. He's not a board-certified pulmonologist. He had no experience dealing with this type of injury at all, and he admitted it. He hadn't dealt with phenol since he was a pharmacist 25 years ago. He had no reactive airway disease. It's a pulmonary injury. It's not an allergy. It's a pulmonary injury. With regard to the other question, thank you for your time. Thank you, Council. Thank you for your arguments. The matter will be taken under advisement. There is a disposition to held issue. The court will stand in brief recess.